**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-2506-WJM-STV

SEAN ALAN FOWLER,

    Plaintiff,

v.

REGIONAL TRANSPORTATION DISTRICT,

    Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Defendant Regional Transportation District's

Motion for Summary Judgment ("Motion") (ECF No. 31).  For the reasons set forth

below, the Motion is granted in part and denied in part.

## I.  BACKGROUND

Plaintiff Sean Fowler brings this Title VII action against Defendant Regional

Transportation District ("RTD"), alleging that RTD discriminated against him on the

basis of his race and subsequently retaliated against him for complaining of that

discrimination.  The following facts are undisputed unless otherwise noted.

Plaintiff is a Caucasian man who has been employed in RTD's Information

Technology ("IT") Division as an Enterprise Resource Planning ("ERP") Functional

Support Analyst since March 2011.  (¶¶ 6–7.)[1]  In May 2016, the position of Lead ERP

---

[1] Citations to a paragraph number, without more, *e.g.* (¶ __), are to paragraphs in
Plaintiff's operative First Amended Complaint (ECF No. 11).

Developer ("Position") became vacant, and Plaintiff applied for the Position.  (¶¶ 9–10.)  Rahul Sood, RTD's Manager of Software Architecture and Development, was in charge of hiring for the Position.  (ECF No. 38 at 17, ¶ 3.)  Mr. Sood is of Asian Indian ethnicity and nationality.  (*Id.*)

After an initial screening of Plaintiff's application, Plaintiff was selected to participate in an "oral technical interview" for the Position, which took place on November 2, 2016.  (¶¶ 11–12.)  On November 15, 2016, RTD notified Plaintiff that he would not be selected for the Position.  (¶ 14.)  By November 23, 2016, RTD had selected an Asian Indian woman, Srimathi Badrisrinivasan (referred to by the parties and hereinafter as "Ms. Badri"), for the Position.  (¶ 15.)  Plaintiff asserts that Ms. Badri was selected because of her and Mr. Sood's shared ethnicity and national origin.  (ECF No. 38 at 25, ¶ 45.)

On November 23, 2016, Plaintiff complained to RTD management about what he believed to be RTD's discriminatory promotion of Ms. Badri.  (*Id.* at 27, ¶ 55.)   After being subjected to what in Plaintiff's view were various forms of retaliation for making this complaint, Plaintiff submitted an internal charge of employment discrimination and retaliation to RTD's Equal Employment Opportunity ("EEO") Department in January 2017.  (*Id.* at 29, ¶ 65.)  In March 2017, Jose Chirinos, RTD's EEO investigator assigned to Plaintiff's claim, found that a violation of Title VII or RTD policy had not occurred.  (*Id.* at 30, ¶ 69.)  Plaintiff formally appealed the findings of Chirinos's investigation in March 2017, and Plaintiff asserts that RTD to date has not resolved this appeal.  (ECF No. 38-2 at 21, ¶¶ 97–98.)

On May 3, 2017, Plaintiff filed a charge of discrimination and retaliation ("First

Charge") with the Equal Employment Opportunity Commission ("EEOC").  (*Id.* at 22, ¶ 105.)  Later that month, according to Plaintiff, RTD "substantially changed [Plaintiff's] job description and duties . . . , removing all specialized skills, experience and educational requirements."  (*Id.*)  Plaintiff asserts that this change in his job description and responsibilities denied him "opportunities that would lead to advancement, recognition and merit increases," among other things.  (*Id.*)

The parties proceeded to mediation with the EEOC on July 11, 2017, which was unsuccessful.  (*Id.* ¶ 108.)  Later that month, the work areas of Plaintiff and RTD's other ERP Functional Support Analyst, Sandy Granger (who is also Caucasian), were relocated from the fifth floor of the office to the tenth floor, the latter of which Plaintiff asserts is a less desirable location than the former.  (*Id.* at 24, ¶ 116.)  RTD also reorganized the IT department in various ways, many of which Plaintiff characterizes as "suspect."  (*Id.* ¶ 117.)  In August 2017, Plaintiff filed a second charge with the EEOC ("Second Charge"), alleging additional retaliation.  (ECF No. 31-31.)

On November 15, 2018, Plaintiff filed his operative Amended Complaint against RTD.  (ECF No. 11.)  On October 4, 2019, RTD filed the instant Motion for Summary Judgment.  (ECF No. 31.)  Plaintiff filed his Response on November 15, 2019 (ECF No. 38), and RTD filed its Reply on December 6, 2019 (ECF No. 49).

## II.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem*

*Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Stone v. Autoliv ASP, Inc*., 210 F.3d 1132 (10th Cir. 2000).  The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

### III.  ANALYSIS

**A.      Discriminatory Promotion Claim**

RTD argues that Plaintiff has not come forward with sufficient evidence from which a jury could conclude that RTD's promotion of Ms. Badri was in violation of Title VII.  The Court disagrees.

A plaintiff who is not a member of a historically discriminated-against group may establish a *prima facie* case of discrimination under Title VII in two ways.  *See Notari v. Denver Water Dep't*, 971 F.2d 585, 588–89 (10th Cir. 1992).  First, if the plaintiff establishes "background circumstances [which] support the suspicion that the defendant is the unusual employer who discriminates against the majority," he or she may rely on the legal framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Notari*, 971 F.2d at 588–89.  Alternatively, "a plaintiff who presents direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff states a prima facie case of intentional discrimination under

4

Title VII." *Id.* at 590.

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment devotes only two and one-half pages of legal argument to the merits of his discrimination claim (and only *one* page of argument as to his retaliation claims).  (ECF No. 38 at 37–40.)  It therefore is difficult for the Court to discern which legal theory of employment discrimination Plaintiff is pursuing in this case.  However, because Plaintiff does mention *McDonnell Douglas*'s requirement of "pretext" (*id.* at 37), the Court assumes that Plaintiff intends to proceed under the *McDonnell Douglas* framework. The Court further concludes that, by failing to adequately brief the relevant legal issues, Plaintiff has waived any argument relying on a theory of discrimination other than that set forth in *McDonnell Douglas*.  *See, e.g.*, *United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013); *Grimaldo v. Reno*, 189 F.R.D. 617, 619 (D. Colo. 1999).

Consequently, to the extent RTD's Motion for Summary Judgment is well supported, Plaintiff must establish a triable issue of fact on the applicable elements of a *prima facie* failure-to-hire claim: (1) RTD's IT Department "is the unusual employer who discriminates against the majority," *Notari*, 971 F.2d at 588–89; (2) Plaintiff applied for a vacancy for which he was qualified and not selected; and (3) after his rejection, "the position remained open and the employer continued to seek applicants from persons of [Plaintiff's] qualifications."  *McDonnell Douglas*, 411 U.S. at 802.  Should Plaintiff establish a *prima facie* case of discrimination, the burden shifts to RTD to offer legitimate, nondiscriminatory reasons for failing to hire Plaintiff.  *See id*.  Assuming RTD can do so, the burden shifts back to Plaintiff to establish that RTD's justifications are

pretextual.  *See id.* at 807.

    1.    *Prima Facie* Case Under *McDonnell Douglas*

As a threshold matter, the Court concludes that Plaintiff has come forward with sufficient evidence from which a reasonable factfinder could conclude that RTD's IT Department "is the unusual employer who discriminates against the majority."  *Notari*, 971 F.2d at 589.

The record reflects that Mr. Sood has a history of hiring and promoting an arguably disproportionate number of Asian RTD employees and contractors.  For instance, Ann Marie Isaac-Heslop, RTD's Manager of Internal and IT Audit, testified that "in the majority of cases," when Mr. Sood had a hiring decision to make, he would select someone of Asian Indian descent.  (ECF No. 38-17 at 41:23–42:5.)  Testifying that this apparent racial preference concerned her, Ms. Isaac-Heslop stated that she "had to sort of go into and actively do some work and look at it."  (*Id.* at 42:6–8.)  After "look[ing] at all the contracts," Isaac-Heslop concluded that "the fact is that a lot of the people that [Mr. Sood] hired were Indian.  As far as me finding any conclusion as to whether he did something wrong or he didn't follow RTD's policies and procedures, I did not conclude that he wasn't. . . . It could have been [an issue]."  (*Id.* at 42:10–43:4.)

RTD contends that Ms. Isaac-Heslop's testimony is "pure speculation" and that the Court should not consider it in ruling on its Motion.  (ECF No. 49 at 12.)  On the face of her testimony, however, this is plainly untrue: Isaac-Heslop stated that she came to her conclusion about Mr. Sood's hiring preferences after reviewing the relevant contractual hiring documents, so it is anything but "pure speculation".  (*Id.* at 42:10–19.)

The Court has no reason to believe that Ms. Isaac-Heslop's testimony would be inadmissible at trial, and the Court considers her testimony to be probative of a racial preference on the part of Mr. Sood in hiring and contracting.

Indeed, aspects of Mr. Sood's own deposition testimony are indicative of a preference to hire and promote persons of Asian descent.  For instance, according to Mr. Sood, all members of the ERP team (at least three people) under his supervision were of Asian origin on the date of his deposition (August 9, 2019).  (ECF No. 38-19 at 23:9–24:25.)  Moreover, all members of the "DBA team"[2] (four to six people—it is unclear from the testimony) under Mr. Sood's supervision were also of Asian origin as of the date of his deposition.  (*Id.* at 25:1–4; 18:8–18; *see also id.* at 24:9–12 (Mr. Sood stating that two contractors were just hired to Ms. Badri's team and that both are Indian).)

Additionally, Mr. Sood testified that, other than Ms. Badri, he has promoted three Asian RTD employees, and that he has hired an Asian woman directly into a senior position.  (*Id.* at 63:15–64:18.)  By contrast, Karen Campbell, a Caucasian woman and the employee under Mr. Sood's supervision who has been at RTD the longest ("about 25-plus years"), has not been promoted to a senior position.  (*Id.* at 64:19–65:15.)  Neither has Howard Wolfe, a Caucasian man under Mr. Sood's supervision whom Mr. Sood agreed is "highly respected and regarded as being talented and skilled."  (*Id.* at 65:16–66:5.)  Another Caucasian man who reported to Mr. Sood, Clint Henry, sought a senior position but did not receive one.  (*Id.* at 66:6–23.)  Mr. Henry subsequently left

---

[2]  The parties do not define the "DBA" acronym.

RTD, and thereafter, an employee of Asian descent was promoted to the position that Mr. Henry had sought.  (*Id.* at 67:3–8; ECF No. 38-1 at 12, ¶ 41.)

Crucially, RTD does not contend that Mr. Sood has *ever* hired or promoted a Caucasian person.  The Court accordingly concludes that, based on the record before it, a jury reasonably could conclude that RTD's IT Department "discriminates against the majority."

Because RTD does not argue that Plaintiff has failed to establish any other element of a *prima facie* case under *McDonnell Douglas*,[3] the burden shifts to RTD to proffer legitimate and nondiscriminatory reasons for hiring Ms. Badri instead of Plaintiff. RTD has satisfied this burden: it asserts that Ms. Badri was selected because she was better qualified and because she outperformed Plaintiff in her interview.  (ECF No. 31 at 20.)  The burden accordingly shifts back to Plaintiff, who must establish a genuine dispute as to whether RTD's justifications for hiring Ms. Badri are pretextual.

2.    Pretext

"A plaintiff demonstrates pretext by showing that the employer's proffered explanation is unworthy of credence."  *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) (internal quotation marks omitted).  "Evidence of pretext may include prior treatment of plaintiff; the employer's policy and practice regarding [ ] employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria."  *Id.* at 1308

---

[3]  More specifically, RTD does not assert that Plaintiff was unqualified for the position (only that Ms. Badri was *more* qualified), or that the Position itself was eliminated subsequent to Plaintiff being rejected.

(internal quotation marks omitted).

As explained in Part II.A.1 of this Order, Plaintiff has put forward evidence indicating that Mr. Sood may have a preference of hiring and promoting persons of Asian descent, to the exclusion of those with other backgrounds.  The Court agrees with Plaintiff that this evidence is also relevant to and could support a finding of pretext in this case.  *See id.*  Plaintiff further argues that certain aspects of the recruitment process for the Position suggest that RTD's justifications for hiring Ms. Badri may be pretextual, and the Court again agrees.

The record reflects that until some point in early 2017, RTD recruitment policies mandated that, to the extent an assessment of a candidate's technical abilities was necessary, such an assessment was to be done through a written test.  (*See, e.g.*, ECF No. 38-17 at 13:13–16:11.)  In fact, RTD's Manager of Staffing and Recruiting, Roger Vesely, testified that from 2011 to the end of 2016 (over the course of 200 to 250 individual recruitments), he could not recall a single instance of an oral technical test being employed in lieu of a written test.  (*Id.* at 16:7–11.)  Mr. Vesely testified that, at some point in early 2017, RTD gave hiring managers the discretion to determine whether a written or oral technical test would be part of the recruitment process for any particular vacancy.  (*Id.* at 12:8–10; 16:12–17:9.)

While it is unclear whether RTD recruitment policies permitted the use of oral technical interviews at the time of its recruitment for the Position, there is testimony in the record indicating that the original policy requiring written tests was in place at that time.  (*See, e.g.*, *id.* at 10:24–11:3; 12:8–10; 14:8–11.)  Resolving factual ambiguities in

favor of Plaintiff (the non-movant), *see Houston*, 817 F.2d at 85, a reasonable inference can be drawn that Mr. Sood's decision to employ an oral technical interview in recruiting for the Position was not in compliance with RTD's established recruitment procedures. To the extent the original policy or practice was still in place at the time of Plaintiff and Ms. Badri's recruitment, Mr. Sood's failure to follow this practice (*i.e.*, the procedural irregularity in Mr. Sood's recruitment for the Position) could be probative of a discriminatory motive.  *See, e.g.*, *Jaramillo*, 427 F.3d at 1308.

Putting the form of the interview aside, the record reflects that certain other aspects of RTD recruitment procedures were not complied with in the hiring of Ms. Badri for the Position.  At the time the recruitment was being conducted, RTD's recruitment procedures were set forth in its Procedures Manual ("Manual").  Of particular relevance, the Manual provided as follows:

THE RECRUITMENT PROCESS

1.     Hiring manager completes and submits an Employment Requisition with appropriate signatures.

2.     Recruiter and hiring manager review the selection tools, which include the test, test scoring, and Interview Guide. If the job is new, a Job Analysis is developed in coordination with the Human Resources Specialist, Compensation and Organizational Development (hereafter referred to as Human Resources Specialist).

3.     Once the selection tools are approved and entered into the electronic Selection Tools Library, the position is posted. Typically internal positions are posted for one week, external positions for two weeks.

4.     Application documents are reviewed and evaluated.

     5.     Selected qualified applicants complete a skills and/or technical knowledge test, if applicable.

     6.     Qualified applicants who pass the test are eligible to interview.

     7.     Hiring manager and/or selection panel coordinate with recruiter to evaluate candidates and make a selection.

     8.     Recruiter obtains approval for a salary offer.

     9.     Recruiter assures that pre-employment screenings are completed.

     10.    Recruiter makes an offer, which may be contingent upon successful completion of a DOT physical, if applicable.

     11.    Recruiter schedules employee's start date.

(ECF No. 31-15 at 16.)

According to Heather McKillop, RTD's Chief Financial Officer and Assistant General Manager of Finance and Administration, all recruitments were expected to be conducted in accordance with the "11 Steps" set forth above in the Manual.  (ECF No. 38-18 at 58:16–22; *see also* ECF No. 38-17 at 10:1–4 (Mr. Vesely stating that recruitments are expected to conducted in accordance with the Manual).)  Ms. McKillop also agreed that the 11 Steps are in place to ensure the recruitment process is fair and nondiscriminatory.  (ECF No. 38-18 at 60:11–15.)

As is apparent from the 11 Steps as excerpted above, before a position is posted, the hiring manager and recruiter are expected to enter the interview guide and any test questions and answers ("Selection Tools") into an internal electronic database. (ECF No. 31-15 at 16; ECF No. 38-18 at 68:15–18 (Ms. McKillop stating that recruiters

"are not to move forward unless they have everything in place").)  Ms. McKillop testified

that, in her view, adhering to this particular order of operations is important to ensure

"that the recruitment can be as fair and unbiased as possible."  (ECF No. 38-18 at

65:4–12.)  It is uncontested, however, that some of these procedures were *not*

followed—for example, RTD does not dispute that the Selection Tools were not

provided to the interview panel members (other than Sarah Cui, RTD's Lead DBA, who

drafted the questions) until the time of the actual interview, several months after the

Position was posted in August 2016.  (ECF No. 38-19 at 37:24–39:6.)  Indeed, one of

the panel members did not receive the answer key at all, which Ms. McKillop

characterized as "unusual" and concerning.  (ECF No. 38-18 at 86:14–19; *see also* 38-

17 at 29:10–17 (Mr. Vesely expressing concern about the same).)  Moreover, Mr. Sood

has indicated that he did not refer to the Manual *at all* during his recruitment for the

Position.  (ECF No. 39-19 at 50:23–51:2.)

　　　　RTD argues that its deviation from recruitment procedures is of limited probative

value in relation to a finding of pretext.  (ECF No. 49.)  This argument is based on the

following statement from the Tenth Circuit's decision in *Bandi v. Colvin*, 618 F. App'x

426, 433 (10th Cir. 2015) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir.

1995) (emphasis in original)): "The mere fact that an employer failed to follow its own

internal *procedures* does not necessarily suggest that the employer was motivated by

illegal or discriminatory intent or that the substantive reasons given by the employer for

its employment decision were pretextual."

　　　　The Court is not persuaded.  Regardless of whether procedural irregularities

*necessarily* are probative of pretext (or whether procedural irregularities *alone* are sufficient to demonstrate pretext), given the current record—especially the considerable evidence suggesting that Mr. Sood may have a preference for hiring and promoting those of South Asian descent—it is the Court's view that the apparent procedural irregularities in RTD's recruitment for the Position are indeed probative of pretext.

In the same vein, RTD points to a footnote from the Tenth Circuit's decision in *Randle* (a reverse discrimination case brought under Title VII), which states: "The authority cited by [the plaintiff] in support of the proposition that procedural irregularities can suggest the existence of illegal discrimination all involved cases where the disregarded procedures directly and uniquely disadvantaged a minority employee."  69 F.3d at 454 n.20.  RTD argues that, because the alleged procedural irregularities in this case did not "directly and uniquely disadvantage[ ] a minority employee," such procedural irregularities do not establish pretext.

The Court similarly does not view this footnote from *Randle* as adding much value to RTD's argument.  First, the Tenth Circuit in this footnote referred only to the authorities the plaintiff in that case had cited for the court.  *Id.*  But even had the Tenth Circuit intended to make a statement about the relevant case law generally, in the Court's view such a statement would not by any means *categorically foreclose* a conclusion in a different case that procedural irregularities which do not "directly and uniquely disadvantage[ ] a minority employee" can be probative of pretext.  While Title VII undoubtedly was enacted to protect minority and historically discriminated-against groups, it protects persons of all racial, ethnic and national-origin backgrounds from

unlawful discrimination.  The Court can discern no compelling reason, consonant with the remedial purpose of Title VII, why procedural irregularities could have probative value in cases involving the alleged discrimination of racial or ethnic minorities, but not in "reverse" discrimination cases.

It is true that three of the four members of the Position's interview panel (including Mr. Sood) have testified that Ms. Badri outperformed Plaintiff in the interview. But it is also apparently true that Mr. Sood was *solely* responsible for subjectively scoring the candidates interview answers, and that he did so at some unspecified time after the interview took place.  (ECF No. 38-2 at 14; ECF No. 38-14 at 87:6–14.) Further, Mr. Sood testified that, prior to the interview, he did not communicate with the interview panel members or anyone else as to how the interviews would be scored. (ECF No. 38-19 at 41:7–10.)  The Court concludes that such circumstances also give rise to the possibility that unlawful discrimination occurred in this case.

## B.    Retaliation Claims

Plaintiff alleges that he was retaliated against, both for complaining to management in November 2016 about RTD's promotion of Ms. Badri, and for filing his First Charge with the EEOC on May 3, 2016.  (ECF No. 38.)  RTD contends that many of Plaintiff's theories of retaliation are foreclosed by his failure to administratively exhaust, and the Court agrees.

Plaintiff's Title VII "claim[s] in federal court [are] generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC."  *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1186

(10th Cir. 2007).  "[T]he charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim; this follows from the rule that each discrete incident of discrimination of retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted."  *Id.* at 1185.  The Court must "liberally construe charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim."  *Id*.

Plaintiff's First Charge reads in relevant part: "During my employment I have been denied promotion on several occasions.  Since complaining about my treatment in or about November 2016, I have been subjected to retaliation, to include but not limited to, being excluded from meetings pertaining to my job and being denied assignments."  (ECF No. 31-29.)  Similarly, Plaintiff's Second Charge reads:

> I was hired by the above employer on March 28, 2011 and I am currently employed as ERP Functional Support Analyst. I filed a previous charge of discrimination against my employer on January 11, 2017.  I participated in an EEOC mediation on July 11, 2017, which ended without an agreement.  Several days later I was forcibly reassigned to a less desirable location and supervisor.  Additionally, my job duties were substantially changed and my job description was changed to remove all specialized skills, experience, and education. I complained of retaliation based on my protected activity, but my employer has not improved the situation.
>
> I believe that I have been discriminated against in retaliation for participating in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(ECF No. 31-31.)

Based on the very limited factual allegations regarding retaliation in these charges, RTD contends that Plaintiff has only exhausted his administrative remedies

with respect to the following retaliatory events: (1) "being excluded from meetings pertaining to my job and being denied assignments" following his November 2016 complaint about Ms. Badri's hiring; and, following Plaintiff's filing of his First Charge, (2) being "forcibly reassigned to a less desirable location and supervisor"; and (3) his job duties having been "substantially changed" and his job description having been "changed to remove all specialized skills, experience, and education."

Plaintiff makes no attempt to argue that he has exhausted his administrative remedies with respect to any other alleged retaliatory events, and the Court concludes that RTD has satisfied its burden on summary judgment to show that there is no genuine factual dispute on this issue.  Accordingly, RTD is entitled to judgment on all claims and theories of liability arising out of any alleged retaliatory events other than those described in numerals (1)–(3) immediately above.  As to the retaliation claims that RTD concedes Plaintiff has exhausted, RTD argues that Plaintiff fails to produce evidence on the elements of those claims sufficient to survive its Motion for Summary Judgment.

Establishing a *prima facie* case of retaliation under Title VII requires Plaintiff to show: (1) he was engaged in opposition to discrimination prohibited by Title VII; (2) he was subjected to a materially adverse employment action subsequent to or contemporaneous with the protected activity; and (3) that there is a causal connection between the protected activity and the adverse employment action.  *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262–63 (10th Cir. 1998).  Should Plaintiff make out a *prima facie* case of retaliation, the burden shifts to RTD to offer legitimate, nondiscriminatory reasons for taking the relevant employment action.  *See McGowan v.*

16

*City of Eufala*, 472 F.3d 736, 744 (10th Cir. 2006).  If RTD meets this burden, the burden shifts again, back to Plaintiff, to establish that those reasons are pretextual. *See id.*

      1.    <u>Denial of Work Assignments</u>

According to Plaintiff, beginning in December 2016 and subsequent to his complaint to RTD management about the hiring of Ms. Badri, Plaintiff's "job responsibilities changed, both in terms of the work that was being assigned to him, and the work that was not being assigned to him."  (ECF No. 38 at 27.)  In particular, Plaintiff asserts that, shortly after Ms. Badri became his direct supervisor, she began to withhold work assignments from Plaintiff and his (Caucasian) coworker Ms. Granger. (ECF No. 38-2 at 18.)  Plaintiff testified that Ms. Badri, who at that point controlled which service tickets were assigned to Plaintiff, intentionally withheld tickets from Plaintiff—and those that she did assign took only a minute or two to complete.  (ECF No. 38-15 at 16:20–17:5.)  Plaintiff asserts, in other words, that Ms. Badri "subjected [him] to coming into work and having nothing to do."  (ECF No. 38-2 at 22.)  Plaintiff additionally testified that Ms. Badri would assign Plaintiff to "development tasks" for which he had not received any training, but would not do the same to Ms. Granger. (ECF No. 38-14 at 118:20–25.)

First, RTD argues that it is entitled to summary judgment on this claim because Ms. Granger, Plaintiff's coworker, did not complain regarding the changes Ms. Badri instituted to her and Plaintiff's job duties, and therefore that such changes do not constitute materially adverse employment actions.  (ECF No. 31 at 32.)  The Court finds this argument to be patently without merit.

An employer's action is materially adverse under Title VII if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *McGowan*, 472 F.3d at 742 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 54 (2006)).  The Court has no doubt that, if Plaintiff had known his complaint about the promotion of Ms. Badri would cause him to consistently come into work and not have any meaningful assignments to work on, he reasonably could have been dissuaded from making that complaint.  Even if it is true that Ms. Granger did not similarly complain (*but see* ECF No. 38-69), this is utterly of no moment.  Nowhere in the statute or the case law the Court has been able to review has there ever been *any* suggestion that the merits of an employee's claim that the terms and conditions of his or her employment have been adversely affected depends in the slightest on whether one or more of his or her coworkers agree with such an allegation.

RTD further argues that the requisite causal connection between Plaintiff's protected activity and the alleged adverse action is lacking.  The basis for this argument is RTD's assertions that "Badri had no retaliatory intent. . . . Badri, as a new supervisor, was entitled to change the way service tickets were assigned, and that likely changed the share of duties provided to her direct reports, Fowler and Granger."  (ECF No. 31 at 33.)  RTD, however, fails to provide any evidence in support of these assertions.

The Tenth Circuit has held that a one-and-a-half month period between protected activity and an adverse employment is sufficient, standing alone, to establish causation.  *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994), *overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1194–97 (10th Cir. 1998).  Plaintiff has testified that he first complained of what he believed to be

the discriminatory promotion of Ms. Badri on November 23, 2016, and that his work duties began to change in December 2016.  (ECF No. 38-2 at 15, 18.)  RTD does not dispute this testimony.  Thus, regardless of when precisely in December 2016 Ms. Badri began withholding work from Plaintiff, the very tight temporal proximity between her actions and Plaintiff's protected activity may alone be sufficient for a reasonable jury to find causation.

Finally, RTD argues that, even if Plaintiff were able to make out a *prima facie* case of retaliation, it has offered a legitimate and nondiscriminatory reason for depriving Plaintiff of work assignments, and that Plaintiff cannot establish that this reason is pretext.  (ECF No. 31 at 37–38.)  In the Court's view, however, RTD fails to satisfy even this very minimal burden of offering a justification for its employment action: RTD simply asserts that "[t]here is nothing unusual about a new supervisor or manager changing workflows or processes for their team."  (*Id.* at 37.)  Regardless of how common or uncommon it is for such changes to take place, RTD has not attempted to explain why Ms. Badri made the *particular* changes to work-assignment procedures affecting Plaintiff that she did.  Accordingly, at this point in the proceedings, Plaintiff is not required to establish pretext on this claim because RTD has failed to offer a legitimate reason for its actions.

The Court concludes that RTD has not satisfied its initial burden on summary judgment to show that no genuine factual disputes exist as to this claim.  RTD's Motion will be denied as to Plaintiff's retaliation claim arising out of Ms. Badri denying him work assignments beginning in December 2016.

2.    <u>Change of Location & Supervisor</u>

Plaintiff asserts that several days after he participated in an EEOC mediation

with RTD in July 2017, he

> was involuntarily relocated to a less desirable location within
> the office (from the fifth floor to the tenth floor), under the
> supervision of a former manager - Sande Grotewohl of the
> Business Analyst Group - from whom they had previously
> been transferred away as a result of what HR had
> acknowledged was a hostile work environment.

(*Id.* at 35.)

To start, Plaintiff does not attempt to explain why the tenth floor is a less

desirable location than the fifth, let alone why relocation to the tenth floor constitutes a

materially adverse employment action.  (*See* ECF No. 38.)  Additionally, Plaintiff

concedes that he had previously *requested* to be placed under a different supervisor,

and that this reassignment was actually beneficial for him to the extent he no longer

had to report to Ms. Badri.  (ECF No. 38-14 at 148:25-149:9.)  As such, the Court

concludes that RTD has satisfied its initial burden to show that no reasonable factfinder

could find in favor of Plaintiff on this retaliation claim.

Other than asserting that Plaintiff had experienced workplace difficulties with Ms.

Grotewohl in the past, Plaintiff's Response to RTD's Motion fails to (1) identify what the

protected activity Plaintiff believes this reassignment was in response to; (2) argue why

this reassignment constitutes a materially adverse employment action; (3) argue that

the employment action was caused by Plaintiff's protected activity; or (4) argue that

RTD's facially benign business reasons for the reassignment (ECF No. 31 at 37) are

pretextual.  (*See* ECF No. 38.)  The Court concludes that Plaintiff's failure in these

respects is a sufficient reason to grant RTD's well supported Motion on this claim. RTD will be granted judgment on Plaintiff's retaliation claim arising out of his transfer to the tenth floor and to Ms. Grotewohl's supervision.

  3. <u>Change in Job Duties & Job Description</u>

  Plaintiff's Response (ECF No. 38) states that, subsequent to Plaintiff filing his First Charge on May 3, 2017, "RTD substantially changed his job description and duties, removing all specialized skills, experience and education requirements, changes which adversely affected Mr. Fowler." (*Id.* at 33.)

  Again, however, neither Plaintiff's Amended Complaint (ECF No. 11) nor his Response to RTD's Motion (ECF No. 38) endeavor to provide *any* specifics about this contention. It is not enough for Plaintiff to make general allegations such as these, point to portions of the record (ECF No. 38 at 27), and invite the Court to craft a legal theory on his behalf. *See Meyer v. Bd. of Cty. Comm'rs*, 482 F.3d 1232, 1242 (10th Cir. 2007). Plaintiff does not even attempt to explain why these events constitute "materially adverse employment actions" that were caused, in the relevant sense, by his engaging in protected activity. Consequently, RTD has met its burden to establish that no reasonable factfinder could find in favor of Plaintiff on this claim, and RTD is entitled to judgment on the same.

**III.  CONCLUSION**

  For the reasons set forth above, the Court ORDERS as follows:

1. RTD's Motion for Summary Judgment (ECF No. 31) is GRANTED IN PART AND DENIED IN PART as follows:

    a.      RTD's Motion is DENIED as to Plaintiff's failure-to-hire claim arising out of RTD's promotion of Ms. Badri to the Position;

    b.      RTD's Motion is GRANTED as to all of Plaintiff's retaliation claims, except that it is DENIED with respect to the retaliation claim arising out of Ms. Badri's withholding of service-ticket assignments beginning in December 2016; and

2.     At the conclusion of this case Defendants will be entitled to judgment on all of Plaintiff's retaliation claims EXCEPT that which arises out of Ms. Badri's withholding of service-ticket assignments beginning in December 2016.

3.     This matter remains pending as to Plaintiff's failure-to-hire claim arising out of RTD's promotion of Ms. Badri to the Position, and as to Plaintiff's retaliation claim arising out of Ms. Badri's withholding of assignments beginning in December 2016.  Both claims remain set to be tried to a jury at a 5-day jury trial to commence on **December 14, 2020 at 8:30 a.m.** in Courtroom A801.

Dated this 21st day of July, 2020.

BY THE COURT:

William J. Martinez
United States District Judge